UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

Eastern District of Kentucky
FILED

FEB 0 5 2026

AT LEXINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

UNITED STATES OF AMERICA

V.                                                                INDICTMENT NO. _____

W. MICHAEL PUTNAM and
LOUIS A. CARMICHAEL,
    aka "Buzz"

\* \* \* \* \*

**THE GRAND JURY CHARGES:**

At all times relevant to this Indictment:

## BACKGROUND

1.   CBA Pharma, Inc., was a company incorporated in Nevada with its principal place of business in Lexington, Kentucky. CBA Pharma conducted some of its operations through several related entities, including CBA Pharma Group, Inc. and CBA Research, Inc. This Indictment collectively refers to these entities as "CBA Pharma."

2.   CBA Pharma held itself out as a biopharmaceutical company. Since at least approximately 1999, CBA Pharma operated with the putative goal of manufacturing, marketing, and distributing a new drug named "CBT-1." CBA Pharma claimed that CBT-1 would combat drug resistance to chemotherapy treatments in cancer patients.

3.   **W. MICHAEL PUTNAM** was the founder and president of CBA Pharma. **PUTNAM** controlled CBA Pharma's day-to-day operations.

4.     **LOUIS A. CARMICHAEL, aka "BUZZ,"** was vice president of capital markets at CBA Pharma.

## FDA Regulation of New Drugs

5.     The FDA regulated the production, sale, and distribution of human drugs pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA").

6.     The FDCA defined a "drug" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals or intended to affect the structure or any function of the human body." 21 U.S.C. § 321(g).

7.     A "new drug" was any drug "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof. . . ." 21 U.S.C. § 321(p)(1).

8.     The FDCA prohibited, among other things, the introduction or delivery for introduction (or causing the introduction or delivery for introduction) into interstate commerce of any new drug prior to FDA approval.

9.     The FDA's Center for Drug Evaluation and Research ("CDER") oversaw the drug approval process. The FDA approval process for new drugs typically followed several steps.

10.    After discovering a potential new drug, a drug developer or sponsor conducted preclinical research to determine, among other things, whether the drug had the potential to cause serious harm. The drug developer or sponsor then submitted an

investigational new drug ("IND") application to the FDA seeking to conduct clinical research on the drug. An IND granted an exemption to the premarket approval requirements that are otherwise applicable for new drugs and allows the drug to be shipped lawfully for the purpose of conducting clinical investigations of that drug. A drug developer or sponsor may not commercially distribute or market an investigational new drug.

11.   After the IND went into effect, the drug developer or sponsor conducted clinical trials to demonstrate that a drug is safe and effective for its intended use. These trials generally occurred in three phases. After developing sufficient information, the drug developer or "applicant" submitted a new drug application ("NDA") to the FDA. The NDA contained a variety of information about the proposed drug, including data from preclinical and clinical trials, directions for use, safety information, proposed labeling, and more. The FDA reviewed the information in the NDA and determined whether it was sufficiently complete to permit a substantive review. If the NDA was materially incomplete or contained one or more major deficiencies, the FDA could issue a "refuse to file" letter notifying the applicant of the reasons and giving them an opportunity for an informal conference. After the conference, the applicant could still request FDA to file the NDA (with or without amendments to correct the deficiencies), and FDA would file and review the NDA "over protest."

12.   When an NDA was filed, the FDA then evaluated the application materials to determine whether to approve the drug. If, after reviewing the NDA, the FDA determined that it was not approvable in its current form, the FDA would send the applicant

a "complete response letter." A complete response letter reflected the FDA's analysis of the data submitted to the NDA and described the specific deficiencies identified during the review of safety and effectiveness data in the application. A complete response letter could also include recommended actions for the applicant to take to obtain approval.

13. After receiving a complete response letter, an applicant could either: (a) resubmit the application after addressing all the identified deficiencies; (b) withdraw the application, without prejudice to a subsequent submission; or (c) request opportunity for a hearing. A resubmission of the application triggered a new review cycle, the length of which depended on the type of information that needs to be evaluated. The FDA could consider the applicant's failure to take any such actions within 1 year after the issuance of the complete response letter to be a request by the applicant to withdraw the application, unless the applicant requested an extension of time in which to resubmit the application. The FDA could consider an applicant's failure to resubmit the application within the extended time period or to request an additional extension to be a request by the applicant to withdraw the application. If the FDA considered the applicant's failure to take action to be a request to withdraw the application, the agency would notify the applicant in writing. The applicant had 30 days to explain why the application should not be withdrawn and to request an extension of time in which to resubmit the application, and the FDA would grant any reasonable request for an extension. If the applicant did not respond satisfactorily to the notification within 30 days, the application would be deemed withdrawn.

14. Ultimately, the FDA would only approve an NDA if it determined that the drug was safe and effective for the drug's intended use.

15. A drug developer or sponsor may not introduce or deliver for introduction (or cause the introduction or delivery for introduction) into interstate commerce any new drug prior to approval of the NDA absent certain exemptions. 21 U.S.C. § 355(i).

<u>CBA Pharma's Failed Attempt To Obtain FDA Approval for CBT-1</u>

16. As noted, CBA Pharma operated with the putative goal of developing and commercializing CBT-1. CBT-1 was a "new drug" under the FDCA, which meant that CBA Pharma had to obtain FDA approval before marketing or selling CBT-1.

17. CBA Pharma obtained an IND in or around late 1993 and reported to the FDA that it conducted eight clinical trials of CBT-1 between approximately 1994 and 2009. During this time, CBA Pharma attempted only one randomized, Phase III trial which did not demonstrate that CBT-1 was effective.

18. Nonetheless, in or around 2010, CBA Pharma submitted an NDA for CBT-1 to the FDA. In response, the FDA sent CBA Pharma "refusal to file" letters in January and September 2011 because the FDA made a threshold determination that the application was insufficiently complete to permit a substantive review and refused to file the NDA. The FDA's September 2011 refusal to file letter outlined a number of deficiencies in the NDA, including that "there is no clinical evidence that CBT-1 is efficacious." Despite these concerns, CBA Pharma asked the FDA to file the NDA, and the NDA was filed "over protest" in or around June 2012.

19. On April 19, 2013, the FDA issued a "complete response letter" to CBA Pharma notifying the company that the FDA could not approve the NDA due to numerous deficiencies in the application. Among those deficiencies was CBA Pharma's failure to

establish through clinical trials that CBT-1 was effective for its intended use. The FDA advised CBA that it should conduct additional clinical trials that demonstrate the safety and efficacy of CBT-1. The FDA also advised CBA that the NDA insufficiently addressed the toxicity of CBT-1, its proposed drug manufacturing process, and a number of other concerns.

20. Throughout the subsequent decade, CBA Pharma requested multiple time extensions from the FDA to address the deficiencies identified in the complete response letter but never completed another drug trial. Indeed, the only clinical trial CBA Pharma attempted during this interval was a Phase I trial, which first enrolled patients in 2018 and enrolled no patients after 2020. In addition to its failure to complete any additional clinical trials, CBA Pharma failed to meaningfully remedy many of the other shortcomings outlined in the FDA's complete response letter.

21. In February 2023, the FDA informed CBA Pharma by letter that the FDA planned to withdraw the pending NDA for CBT-1, noting that significant time had passed since the agency issued the Complete Response Letter and there had been no substantive response by the company. After further communication with CBA Pharma, the FDA sent CBA Pharma a letter on or about April 3, 2023, informing the company that the FDA was withdrawing the NDA for CBT-1.

22. Despite the FDA's withdrawal of the NDA for CBT-1 and CBA Pharma's failure to complete any additional clinical trials of CBT-1, CBA Pharma sent a "response" to the complete response letter on April 25, 2023, approximately 10 years after the FDA issued it and several weeks after the FDA had already withdrawn the NDA. The

information in CBA Pharma's "response" did not remedy the concerns raised in the 2013 response letter. Because the FDA had already withdrawn CBA Pharma's prior NDA for CBT-1, the FDA informed CBA Pharma that it would have to submit the information in its "response" as a new NDA.

23. On February 14, 2024, CBA Pharma submitted another NDA for CBT-1. On April 12, 2024, the FDA issued a refusal to file letter, again notifying CBA Pharma that it was refusing to file the new NDA because it contained numerous deficiencies that would preclude a substantive review of the application. Among the many deficiencies identified in the April 12, 2024, letter was CBA's persisting failure to demonstrate the efficacy of CBT-1 through clinical trials.

24. The FDA never approved CBT-1 as a human drug for distribution in interstate commerce.

The Scheme to Defraud Investors

25. For much of its existence, CBA Pharma funded its operations with financial investments from investors via the sale of stock offerings. **PUTNAM** and **CARMICHAEL** played significant roles in raising money from investors on behalf of CBA Pharma.

26. In or around 2022, CBA Pharma, through **PUTNAM** and **CARMICHAEL**, and others, began soliciting investment in a putative "royalty" program. In most instances, CBA Pharma told investors in the royalty program that the return on their investment "will be paid from the revenues of sales of CBT-1® for cancer after FDA approval" and that "net revenues will be split 50-50 between CBA Pharma and the Royalty Holders until a

ceiling equal to 40x the investment has been achieved[.]" CBA Pharma also included an "equity kicker" of "two shares of CBA common stock" for every dollar invested in the royalty program. CBA Pharma told investors that the company was only keeping the "40x open for a short time, after which we will be dropping to 20x, then to 10x."

27.  **PUTNAM** and **CARMICHAEL** regularly communicated with current and prospective investors and made a variety of representations about CBA Pharma's activities and prospects for financial success. These representations often included enthusiastic claims about CBT-1's efficacy. **PUTNAM** and **CARMICHAEL** repeatedly made false and misleading claims about the likelihood of FDA approval for CBT-1 and the company's corresponding prospects for financial success.

28.  From a time, unknown but no later than 2023 through 2024, **PUTNAM** and **CARMICHAEL**, and others known and unknown, engaged in a scheme, plan, and artifice to defraud investors as to a material matter and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

29.  In furtherance of this scheme, **PUTNAM** and **CARMICHAEL** made materially false and misleading statements to current and potential investors. In particular, **PUTNAM** and **CARMICHAEL** made, or caused to be made, a variety of false and misleading representations about (1) the probability and timing of FDA approval of CBT-1, (2) the demonstrated efficacy of CBT-1, and (3) the likelihood of CBT-1's commercial success. For instance, although the FDA had withdrawn the NDA for CBT-1 in April 2023 (requiring the submission of a new NDA) and despite CBA's failure to complete any

additional clinical trials since receiving the Complete Response Letter in 2013, **PUTNAM** and **CARMICHAEL** made the following false and misleading statements:

    a. At different times throughout 2023 and early 2024, **PUTNAM** and **CARMICHAEL** sent, or instructed other CBA Pharma employees to send, via email a document entitled "CBA Pharma Investment Summary." In that document, CBA Pharma claimed that "CBT-1® is at the final stages of the drug development process with the FDA, demonstrating that this orally administered drug has an impeccable safety profile, is effective, and is a viable commercial product." The document also told potential royalty investors that there was a "[s]mall investment time frame (2-year target to complete FDA approval and enter marketplace)" and that "[m]ost of the time-consuming aspects of the drug development process for CBA's drug have been completed." The document reassured investors that "[f]inal new drug approval from the FDA is probable during the next two years" and that "[r]isk is low. CBT-1® is in the final stages of the FDA drug development process."

    b. Similarly, at different times throughout 2023 and early 2024, **PUTNAM** and **CARMICHAEL** sent, or instructed other CBA Pharma employees to send, via email a document entitled "CBA Pharma Presentation and Outline." In this document, CBA Pharma claimed that "CBA has done a remarkable job of shepherding CBT-1® through the FDA drug development process, demonstrating that this orally administered drug

has an impressive safety profile, is effective, and is a viable commercial product. CBT-1® is on course to be first-in-class as the first multidrug resistance modulator ever approved by the FDA." The document also claimed that "CBA Pharma's current strategy is to complete the phase I/II CBT-1® cancer clinical trials over the next 18 months, then submit the findings to the FDA for final approval."

c. On May 29, 2023, **CARMICHAEL** sent an email to a potential investor claiming, "We have and answered our Complete Response Letter with the FDA (game changer, 18 months ahead of schedule [sic]) FDA has 6 months to get back to us . . . ."

d. In or around June 2023, **PUTNAM** authored a document intended for prospective investors in CBA Pharma's royalty program entitled "Why CBA's Royalty Funding Program is Not Too Good to Be True." In that document, **PUTNAM** stated that CBA Pharma had filed "our response to the FDA's Complete Response Letter" which was "the last milestone to get FDA approval of our multidrug resistance modulator drug for cancers, CBT-1®[.]" The document made a number of claims about the likely commercial success of CBT-1, including claiming that "[t]he first year market potential for CBT-1 in the USA only is $137 Billion because our approval will be for all types of cancers (over 500 types)." **CARMICHAEL** repeatedly sent, or directed another CBA Pharma

employee to send, this document to a number of potential investors in 2023 and 2024.

e. On June 16, 2023, **CARMICHAEL** sent an email to a prospective investor stating that "[t]he final clinical trial activity for CBT-1® with the FDA is being led by Massachusetts General Hospital/Harvard Medical Center, currently the number one cancer research in the United States," and that because the recipient of the email had "been a loyal shareholder who has participated in past Company funding activities that have resulted in CBT-1® being at the doorstep of FDA approval," he or she was "invited to participate in a limited first-come, first-served favorable funding opportunity to launch our final strategic push to achieve FDA approval."

f. On June 21, 2023, **CARMICHAEL** wrote to another potential investor that "we have decided to go for approval now, which means you most likely will receive the Royalty [sic] in a year…big game changer….no Complet[e] Response letter filled [sic] has not received final approval…please call after you read the attached and thank you for your interest……we could pay off all those student loans . . . ."

g. Also on June 21, 2023, **CARMICHAEL** wrote to another potential investor that "this is big and a GAME CHANGER for the company and the shareholders and most importantly the Royalty [sic] holders who are throwing money at us….it is a 40 to one when the CBT-1 is

approved....which will most likely be in 6 to 9 months and the ½ of the revenues to the company (shareholders) and the other ½ to pay the royality [sic] holders . . . ."

h. On December 8, 2023, **CARMICHAEL** sent an email to an investor claiming that "we have a very high probability that we will be generating over $ 1 Billion per month in CBT-1 sales within 9 to 12 months."

i. On January 8, 2024, **CARMICHAEL** met with a potential investor in person, while **PUTNAM** joined the meeting over the phone. In that meeting, **PUTNAM** told the potential investor that "by all measurements we have a very strong potential in the neighborhood of a billion dollars a month in sales" and also predicted that "within 6 months, we will have the FDA approval." Also, during the January 8, 2024, meeting, **PUTNAM** stated, "And now it turns out the last group that was doing clinical trials for us which is the Mass General Hospital and Harvard Medical Center in Boston and they're estimating how this will be the largest pharmaceutical drug in history."

j. During a January 11, 2024, in-person meeting with a potential investor, **CARMICHAEL** stated, "What they're [the FDA] trying to do is make sure the drug is safe and does it work 15% of the time. It could not work 85% of the time and they'll still approve it. We, ours is well over 85 to 100% working." **CARMICHAEL** also stated during the same meeting

that "if we count anywhere from 3-9 months from now it would be a pretty good indication of getting final approval. It might even be sooner."

k. On a January 19, 2024, **PUTNAM** and **CARMICHAEL** held a telephone call with a potential investor in which **PUTNAM** discussed CBA Pharma's putative "sales estimates" for CBT-1, claiming that "we tried to keep them conservative that first year, even though it doesn't sound conservative, at $12 Billion" and that "[w]e think it's going to end up being a lot more than that, but that's those are good solid working numbers." **PUTNAM** also discussed the likelihood of CBT-1 securing FDA approval, stating, "Where we're at right now, once you've gotten that complete response letter and filed it, you're at, you're at a point of ah basically, ah, a 99% chance of approval and the FDA has never turned down a drug that was responding to a complete response letter."

l. Also during the January 19th, 2024, telephone call, **PUTNAM** further explained CBA Pharma's efforts to coordinate with three large drug distribution companies. **PUTNAM** claimed that one of the companies "say this is the, one of the biggest drug, drugs that they've ever represented in history[.]"

m. On February 14, 2024, **CARMICHAEL** received an email from a royalty investor inquiring about CBA Pharma's progress with the FDA. In response, **CARMICHAEL** stated "3 TO 5 MONTHS FOR FINAL APPROVAL…"

30. In the course of these and similar communications with current or prospective investors, **PUTNAM** and **CARMICHAEL** concealed material facts. For instance, **PUTNAM** and **CARMICHAEL** did not disclose that the FDA had withdrawn the NDA for CBT-1 in April 2023 or that any additional submissions to the FDA would be reviewed as a new NDA. Similarly, **PUTNAM** and **CARMICHAEL** did not tell current or prospective investors that the FDA had repeatedly told CBA Pharma that it had not sufficiently demonstrated the efficacy of CBT-1 through clinical trials. **PUTNAM** and **CARMICHAEL** also failed to accurately describe the state of CBA Pharma's clinical trials, including the Phase I clinical trial that commenced in or around 2018 and had not enrolled additional patients in several years.

31. **PUTNAM's** and **CARMICHAEL's** misrepresentations were materially false and misleading. These misrepresentations caused current or prospective investors to believe that CBT-1 would receive FDA approval and become a commercially viable product in the near future, thereby increasing the value of their investments. In reality, CBT-1 had a very low probability of receiving FDA approval in the near term, if ever.

## COUNT 1
### Conspiracy to Commit Wire Fraud
### 18 U.S.C. § 1349

32. The allegations contained in paragraphs 1 through 31 are realleged and incorporated as if set forth fully herein.

33. From in or about 2023 through in or about 2024, in Fayette County, in the Eastern District of Kentucky, and elsewhere,

**MICHAEL PUTNAM and**

**LOUIS A. CARMICHAEL, aka BUZZ,**

and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of execution of such scheme and artifice, in violation of 18 U.S.C. § 1343.

### COUNTS 2-12
### Wire Fraud
### 18 U.S.C. § 1343

34. The allegations contained in paragraphs 1 through 31 are realleged and incorporated as if set forth fully herein.

35. On or about the dates set forth below, in Fayette County, in the Eastern District of Kentucky, and elsewhere,

**MICHAEL PUTNAM and**
**LOUIS A. CARMICHAEL, aka BUZZ,**

for the purpose of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, knowingly caused to be transmitted by means of a wire communication in interstate commerce certain writings, signs, signals, pictures and sounds, as follows:

| Count | Approximate Date | Investor | Wire Description |
|---|---|---|---|
| 2 | May 29, 2023 | B.H. | Email from Buzz Carmichael's CBA-1.com email account to B.H.'s Gmail account with |

| Count | Approximate Date | Investor | Wire Description |
|---|---|---|---|
|  |  |  | subject line "Game changer at CBA personal" |
| 3 | June 21, 2023 | E.T. (as Trustee) | $25,030.00 wire from Bank of America, NA to JP Morgan Chase |
| 4 | June 21, 2023 | S.N. | Email from Buzz Carmichael's CBA-1.com email account to S.N.'s Gmail account with subject line "FW: Why CBA's Royalty Funding Program is Not Too Good to Be True - 06.15.2023" |
| 5 | July 13, 2023 | T.H. | Email from Buzz Carmichael's CBA-1.com email account to T.H.'s Gmail account with subject line "FW: Why CBA's Royalty Funding Program is Not Too Good to Be True - 06.15.2023" |
| 6 | July 15, 2023 | N.K | Email from Buzz Carmichael's CBA-1.com email account to N.K. with subject line "RE: Why CBA's Royalty Funding Program is Not Too Good to Be True - 06.15.2023" |
| 7 | August 1, 2023 | M.W. | Email from CBA-1.com account to Yahoo email account with subject line "CBA Pharma Royalty Funding Program - Certificate of Agreement - 08.01.2023" |
| 8 | August 9, 2023 | D.H. | Email from CBA-1.com account to D.H.'s Gmail account with subject line "CBA Pharma Royalty Funding Program - Certificate of Agreement - 08.09.2023" |
| 9 | August 10, 2023 | J.T. | Email from Buzz Carmichael's CBA-1.com email account to J.T. with subject line "CBA Pharma Royalty Funding Program - Certificate of Agreement - 08.10.2023" |
| 10 | August 12, 2023 | J.C. | Email from Buzz Carmichael's CBA-1.com email account to J.C. with subject line "FW: CBA Pharma Certificate of Agreement - Royalty Funding Program" |

| Count | Approximate Date | Investor | Wire Description |
|---|---|---|---|
| 11 | August 21, 2023 | R.T. | Email from CBA-1.com account to R.T.'s Gmail account with subject line "CBA Pharma Royalty Funding Program - Certificate of Agreement - 08.21.2023" |
| 12 | August 31, 2023 | D.C. | Email from CBA-1.com email account with subject line "CBA Pharma Royalty Funding Program" |

## FORFEITURE ALLEGATIONS
## 18 U.S.C. § 981(a)(1)(C)
## 28 U.S.C. § 2461(c)

1. By virtue of the commission of the offenses alleged in Counts 1-12, **W. MICHAEL PUTNAM** and **LOUIS A. CARMICHAEL** shall forfeit to the United States any and all property, real or personal, which constitutes or is derived from proceeds traceable to the violations of 18 U.S.C. §§ 1343 and 1349. Any and all interest that **W. MICHAEL PUTNAM** and **LOUIS A. CARMICHAEL** have in this property is vested in and forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

2. The property to be forfeited includes, but is not limited to, the following:

**CURRENCY:**
a. $134,770.04 seized from JP Morgan Chase Bank account ending x3939 in the name of CBA Pharma Group, Inc., on or about February 28, 2024;
b. $42,555.27 seized from JP Morgan Chase Bank account ending x7658 in the name of CBA Pharma Group, Inc., on or about February 28, 2024;
c. $1,502,569.86 seized from JP Morgan Chase bank account ending x6900 in the name of CBA Pharma, Inc., on or about February 28, 2024;
d. $174.73 seized from JP Morgan Chase Bank account ending x2611 in the name of CBA Research, Inc., on or about February 28, 2024; and
e. $118,444.98 seized from JP Morgan Chase Bank account ending x1438 in the

name of CBA Pharma Group, Inc., on or about February 28, 2024.

**MONEY JUDGMENT:**
A forfeiture money judgment in an amount representing the gross proceeds in aggregate obtained by **W. MICHAEL PUTNAM** and **LOUIS A. CARMICHAEL** as a result of the violations alleged in this Indictment.

3.      If any of the property listed above, as a result of any act or omission of the Defendant(s), (A) cannot be located upon the exercise of due diligence; (B) has been transferred or sold to, or deposited with, a third party; (C) has been placed beyond the jurisdiction of the court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty, the United States shall be entitled to forfeit substitute property pursuant to 21 U.S.C. § 853(p).



PAUL C. MCCAFFREY
FIRST ASSISTANT UNITED STATES ATTORNEY

## **PENALTIES**

**COUNTS 1-12:**  Not more than 20 years imprisonment, $250,000 fine or twice the gross gain or loss, and 3 years supervised release.

**PLUS:**  Mandatory special assessment of $100.

**PLUS:**  Restitution, if applicable.